```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
WILLIAM POWELL,
                    Petitioner,    04 Civ. 1413(DAB)(DFE)

        - against -
                                   REPORT AND RECOMMENDATION
BRIAN FISHER,                      TO JUDGE BATTS
Superintendent,
Sing Sing Correctional Facility,
                    Respondent.
----------------------------------X
```

DOUGLAS F. EATON, United States Magistrate Judge.

William Powell brings this *pro se* habeas petition challenging his 2001 conviction for Arson in the Second Degree and Reckless Endangerment in the First Degree, after a jury trial in Supreme Court, Bronx County. Justice Phylis Skloot Bamberger sentenced Powell, as a second felony offender, to a determinate prison term of 24 years on the arson count. On the lesser count, she imposed a concurrent term of three and one-half to seven years.

At trial and sentencing, Powell was represented by Eric Sachs. On appeal, Powell was represented by Abigail Everett, an attorney with the Center for Appellate Litigation. The Appellate Division unanimously affirmed the conviction and sentence. *People v. Powell*, 309 A.D.2d 577, 765 N.Y.S.2d 505 (1st Dept. 2003). On December 1, 2003, Judge Carmen B. Ciparick denied leave to appeal to the New York Court of Appeals. *People v. Powell*, 1 N.Y.3d 578, 775 N.Y.S.2d 794 (Ct. App. 2003).

Powell then promptly came to our Court. His *pro se* habeas petition was received by our Pro Se Office on January 7, 2004. Powell's petition includes two point headings from Ms. Everett's appellate brief, but he fashioned his own argument for each section. Powell wisely did not include Ms. Everett's third point, as that was solely a state-law claim about the sentence.

On December 27, 2004, Assistant District Attorney Rafael A. Curbelo filed an opposing affidavit which annexed his memorandum of law and Exhibits 1 through 13. (I will cite to certain of those exhibits as "Ex. __.")

Powell's six-page traverse was received on January 25, 2005.

The transcript of the state court proceedings was ordered last year by the District Attorney's Office, but it has not been retrieved from storage by the clerks in Supreme Court, Bronx County. (Curbelo Aff. ¶ 4.) I agree with A.D.A. Curbelo that the transcript is unnecessary to the resolution of this habeas petition. The trial evidence was summarized in detail by Powell's appellate attorney. (Ex. 1, pp. 28-37.) Powell's primary argument is that Justice Bamberger erred when she found that he was mentally competent to stand trial. On that issue, A.D.A. Curbelo has annexed several of the competency reports and Justice Bamberger's 57-page opinion. In addition, Powell's appellate attorney extensively quoted portions of the transcript pertinent to competency. (Ex. 1, pp. 3-28, 44-49.)

<u>THE TRIAL EVIDENCE</u>

Powell's appellate attorney summarized the trial evidence at Ex. 1, pp. 28-34. Her summary included the following:

> The twenty-three year old complainant, <u>Marsha Higgins</u>, was an "exotic" dancer at a club called, "Mr. Wedge" (MH 362)....
> In August, 1998, appellant came into the club, bought her a drink, tipped her $75 and asked her to have sex (MH 368-369). She turned him down but appellant became a regular customer and started giving her bigger tips, sometimes $100 (MH 366, 369)....
> The complainant testified that appellant began stalking her (MH 374)....
> [On] October 25th, appellant returned to the club (MH 379). They argued again and appellant threatened the complainant that she was "going to be homeless" (MH 380). The complainant "went to go attack him" and appellant threatened to kill her (MH 380). The bouncers threw appellant out again (MH 380). Not taking appellant's threats seriously, the complainant danced another set before hurrying home to her mother's apartment at 4240 Byron Avenue (MH 380-382; MH 440).
> That night, at about 3:00 in the morning, there was a fire in the hallway outside the second-floor apartment where the complainant, her mother and stepfather were all asleep (MH 364, 383; DH 345). <u>Fire Marshall Michael Farrell</u> determined that the fire originated on the hallway floor in front of the door to the mother's apartment (MF 475). The Fire Marshall smelled gasoline at the site (MF 476). On the hallway stairs between the first and second floors, he recovered a book of matches bearing the "Mr. Wedge" club logo (MF 491-491; MH 366).

2

The fire largely destroyed the apartment door but there was very little damage inside the apartment and no one was injured in the fire (DH 345; MF 507).

The following morning, the complainant spoke to appellant;... [S]he testified he asked to meet on 234th Street (MH 413). The complainant admitted that she "was trying to, like, be nice to him, like, to set him up." (MH 387).

At about 12:30 P.M., [October 26, 1998], Detective Michael Mulroy went over to the three-story apartment building and spoke to the complainant and her friend, Tweety, also a dancer from the club (MM: 241, 243; MH 388). When he arrived, the complainant was distraught (MM 243). The detective put the two women in his unmarked car and, according to the complainant, they drove toward 234th Street "so we could catch him because he was supposed to be coming to my house" (MM 243-244; MH 389). [Footnote omitted.] The complainant pointed out appellant quickly walking along 234th Street towards complainant's home (MH 290; MM 246-247).

According to the detective, appellant was carrying a plastic bag which he put down near a parked car (MM 246-247). The detective stopped, grabbed appellant at gun point, handcuffed him and walked him over to the bag where the detective found two plastic beverage bottles containing gasoline (MM 248-250, 319)....

Approximately six or seven hours after his arrest, appellant was taken to speak to A.D.A. DeMeo, who read the Miranda warnings before questioning appellant on videotape with Detective Mulroy (MM 272-273, 312; People's Exhibit 13). At the beginning of the taped interview, appellant admitted that "the house was set on fire by me" because the complainant had been "harassing" him and treating him "like a dog."...

[Appellant] discussed his personal "psychiatric problems since he was a kid" and his drug use. He recognized that he had "many problems" and "sometimes" acted "crazy." Appellant also stated that he was employed loading trucks and seeing a counselor twice a week but he had not gone the week of the incident. Nor had he taken his medication.

In response to the questions from Assistant District Attorney DeMeo, appellant described how he put gasoline in a soda bottle with a rag and threw the lit bottle at the apartment door. Appellant claimed that he thought neither the complainant nor her family were at home.

The tape ends at 7:53 P.M. and begins again at 8:00 P.M. After asking if appellant still understood his

3

rights, the prosecutor asked [him] to discuss the
circumstances of his arrest earlier that day. Appellant
stated that the complainant and he had agreed to meet in
front of the nail salon near her building. Appellant
admitted taking along a soda bottle filled with gas [on
this second occasion,] but repeatedly denied that he
planned to do anything with it other than scare the
complainant.

(Ex. 1, pp. 28-34.)

### POWELL'S MENTAL COMPETENCY: REPORTS, HEARING AND DECISION

In a 57-page opinion dated August 30, 2001 (Ex. 11), Justice Bamberger carefully explained why she eventually made the factual finding that Powell was competent to stand trial. She discussed the conflicting reports of various mental health professionals, as well as her own observation of Powell's behavior throughout a two-day competency hearing, and a suppression hearing, and the aborted first trial, and the second trial.

The first set of reports was based on court-ordered examinations that occurred on February 2, 1999, three months after the arson. Two Bellevue Hospital psychiatrists, Dr. Alexander S. Bardey and Dr. Robert H. Berger, reported that Powell was fit to proceed. (Ex. 6; Ex. 7; *see* Ex. 11, pp. 1-2.)

In the next year, Powell was examined by three doctors selected by the defense -- psychiatrist Dr. Sheryl L. Salaris and psychologists Dr. Erica Weissman and Dr. Howard Epstein. All three reported that Powell was unfit for trial. (Ex. 9; Ex. 10; I do not have Dr. Epstein's report, but it is summarized at Ex. 11, pp. 4-5.) The prosecution did not challenge those reports at the time. On September 28, 2000, Justice Bamberger found Powell incompetent to stand trial at that time; she committed him to Mid-Hudson Forensic Psychiatric Center. (Ex. 11, pp. 2-5.)

After Powell was treated at Mid-Hudson, a psychiatrist there, Dr. Muzaffar M. Khan, found Powell competent to stand trial. On January 2, 2001, Dr. Khan submitted his findings to the court. (*See* Ex. 11, pp. 5-6.)

The competency hearing took place before Justice Bamberger on January 22 and March 30, 2001. She heard testimony from Dr. Kahn and Dr. Epstein on the first day; Powell refused to enter the courtroom. Dr. Kahn testified that Powell was competent. (*See* Ex. 11, pp. 7-8.) Dr. Epstein testified that Powell understood the nature of the proceedings, but lacked the

4

capability to have a working relationship with his attorney. (*See* Ex. 11, pp. 9-12.)

A fourth and final set of reports was prepared by two defense experts, based on a March 13, 2001 examination of Powell. Once again, Dr. Weissman found Powell unfit for trial. Dr. Melissa Kaye, a psychiatrist with the Forensic Evaluation Service, also found Powell unfit for trial. (*See* Ex. 11, pp. 12-13.)

Dr. Weissman and Dr. Kaye testified on March 20, 2001. (*See* Ex 11, pp. 13-17.) Powell was in the courtroom and Justice Bamberger repeatedly asked him about courtroom procedures. His answers showed that he understood the procedural phases leading up to trial. (*See* Ex. 11, pp. 17-20.)

Powell attended part of the April 10, 2001 suppression hearing. He articulated the differences between a *Mapp* hearing, a *Huntley/Miranda* hearing and a *Dunaway* hearing. When he was uncertain about a particular component of a hearing, he informed the judge of his uncertainty. (*See* Ex. 11, pp. 20-23.)

On April 10 and 30, 2001, Justice Bamberger determined that Powell was competent and that he was malingering. (*See* Ex. 11, pp. 23-25.) On April 30, she conducted a *Sandoval* hearing and completed jury selection.

Also on April 30, defense counsel belatedly requested permission to assert a defense of mental disease or defect. (*See* Ex. 11, pp. 25-26.) The next day, Justice Bamberger declared a mistrial and gave the defense an opportunity to try to find a witness to support that belated defense. (*See* Ex. 11, pp. 33-37.) Powell was again examined by the defense psychologist, Dr. Epstein, who now focused on the insanity defense but ultimately rejected it. On May 21, 2001, he wrote: "it is my professional opinion that he would not be able to mount a psychiatric defense." (*See* Ex. 11, p. 37.)

On June 11, 2001, the trial began with selection of a second jury. Powell refused to leave his holding pen. Justice Bamberger went to the holding pen and spoke with him. She again discussed the rights afforded him. Powell acknowledged that he understood these rights, but he choose not to enter the courtroom. During each day of the trial, Mr. Sachs reported to the judge about his meetings with Powell. He repeatedly reported that Powell was unwilling to come to the courtroom. He reported that Powell was interested in pleading guilty if he could get a promise of the minimum sentence (eight years), but that offer was

5

rejected. (*See* Ex. 11, pp. 37-39.)

There is no claim attacking the validity of Powell's waiver of his right to attend his second trial. In Powell's absence, Mr. Sachs did not present any witnesses; in summation, Mr. Sachs "argued, essentially, that the complainant framed appellant to get him off her back (605). Counsel suggested that she set the fire, planted the dance club matches in a prominent place on the steps, and lured the appellant over the next morning [in order to get him arrested]." (Ex. 1, pp. 36-37.)

## DISCUSSION

The first point in Powell's petition reads as follows:

> THE PEOPLE FAILED TO PROVE THAT APPELLANT WAS COMPETENT TO STAND TRIAL WHERE THREE DOCTORS - TWO OF THEM CALLED BY THE COURT - TESTIFIED THAT APPELLANT WAS INCOMPETENT, THE PEOPLE'S WITNESS CONCEDED THAT HIS COMPETENCY FINDING WAS BASED ON HIS BELIEF THAT "THE CRITERIA" FOR COMPETENCY "IS NOT A VERY HIGH ONE" AND THE COURT[']S PERCEPTION OF APPELLANT'S WILLINGNESS TO PARTICIPATE WAS HIGHLY SPECULATIVE. U.S. Const. VI, XIV; N.Y. Const. Art. §6

(Ex. to the Petition, p. 5(a).) In her post-trial opinion Justice Bamberger gave a thorough explanation for her findings that Powell was competent. (Ex. 11, esp. pp. 40-57.) At pages 41-44, she explained that Powell understood the nature of the proceedings against him. This finding is not challenged. The dispute is whether Powell was able to assist the attorney and aid in the preparation of his defense. This topic was covered by Justice Bamberger's opinion at pages 44-57.

At pages 45-51, she discussed a number of occasions when Powell spoke to her and spoke to his attorney.

At pages 52-54, she found that Powell's on-and-off willingness to participate in court proceedings was part of a pattern that showed deliberate behavior:

> The defendant generally refused to appear in the courtroom whenever there was any testimony or discussion about the details of the crimes with which he was charged. He also refused to appear in the courtroom whenever any steps were taken by the court to bring the case closer to trial. Further, the defendant would appear in the courtroom to participate in the proceedings

6

when it was likely that the trial would be delayed.

(Ex. 11, p. 52.)  For example, Powell belatedly raised the possibility of a defense of temporary insanity, but did not decide to pursue it until he learned that indecision would not delay the first trial, but decision would delay it. (*Id.*, p. 53.)

At pages 54-55, Justice Bamberger rejected the opinions of Drs. Weissman, Solaris, Epstein and Kaye.  She explained:

> [They] based their conclusions in large part on the defendant's refusal to cooperate with them during the psychiatric examinations. ... As a result, these [four] doctors concluded that the defendant was incapable of consulting with his attorney and assisting in his own defense.
> The record, as set out exhaustively above, shows that the defendant conferred about his case, understood sufficiently the legal process and communicated with his counsel.  Very simply the conclusions reached by [four of] the doctors are inconsistent with what actually happened in these proceedings.  The defendant's refusal to talk with the doctors, is in this Court's opinion, part of the defendant's deliberate conduct. [Citation of case law omitted.]
> The defendant was selectively cooperative and this Court accepts the testimony of Dr. Khan, who was the only doctor who had the opportunity to view the defendant over an extended period of time.  Dr. Kahn testified that the defendant had the capacity to rationally cooperate with people but made a conscious decision to cooperate with only certain people and that a "psychotic individual would not behave that way; they are consistently sick." Competency Hearing at 17.  He gave as an example the defendant's conduct at Mid-Hudson where he cooperated with <u>the lower-level staff</u> and <u>his peers</u> at the facility but was less cooperative with the psychologists and other members of the clinical staff. Competency Hearing at 14, 17.  Thus, Dr. Kahn opined that the defendant had the capacity to work with his attorney and that his lack of cooperation was based "on his desire not to rather than not having the capacity to."  Competency Hearing at 27.

(Ex. 11, pp. 54-55, with my emphasis.)

When the Appellate Division affirmed Powell's conviction, it wrote:  "After a thorough hearing, the court properly determined that defendant was competent to stand trial, and, as to that

7

aspect of the appeal, we affirm for the reasons stated by Justice Phylis Skloot Bamberger." *People v. Powell*, 309 A.D.2d 577, 765 N.Y.S.2d 505 (1st Dept. 2003).

A federal habeas petitioner must present "clear and convincing evidence" to overcome the statutory "presumption of correctness" that applies to "a determination of a factual issue by a State court." 28 U.S.C. § 2254(e)(1). This presumption applies to "a state court's conclusion regarding a defendant's competency." *Demosthenes v. Baal*, 495 U.S. 731, 735, 110 S. Ct. 2223 (1990); *see also Saunders v. Edwards*, 2003 WL 22871912, *2 (S.D.N.Y. Dec. 4, 2003) (Buchwald, J.).

Powell's traverse brief says:

> Respondents have failed to prove by credible evidence that petitioner had the ability to assist in his own defense. The court[']s theory of a "distinct pattern" of petitioner malingering was speculative at best and offered no credib[]le evidence on petitioner's competency. Though the Respondent[']s Exhibit Two pp. 22-24 has petitioner "talking" about the case, petitioner's rambling is no real indication that petitioner was competent and was err[one]ously relied upon.

(Traverse Brief, p. 3.)

In view of Justice Bamberger's extensive first-hand interaction with Powell, and her careful explanation of how she resolved the conflicts in the doctors' testimony, Powell's arguments are not sufficient to overcome the presumption of correctness. Powell cooperated with his attorney in an effort to suppress his confession, and an effort to find a psychiatrist who would support a theory of temporary insanity, and an effort to get the prosecution to agree to a minimum-sentence plea bargain. When all those efforts failed, it was not irrational for him to refuse to attend his trial. For all the reasons stated above, the petition's first point should be rejected.

The second point in Powell's petition reads as follows:

> THE COURT ERRED IN REFUSING TO CHARGE THE JURY ON THE VOLUNTARINESS OF STATEMENTS AND PRECLUDING THE DEFENSE FROM ARGUING INVOLUNTARINESS ON SUMMATION. U.S. CONST. VI, XIV; N.Y. CONST. ART 1. §6

(Ex. to the Petition, p. 5(b).) After the close of the trial

8

evidence, Justice Bamberger said "there is no evidence that the officers coerced [Powell]" to make his videotaped confession. Hence she directed defense counsel not to argue, in summation, that the confession was "involuntary" or "coerced."

On the other hand, she told Mr. Sachs that he could argue "that what he [Powell] said isn't true," and he could argue that the confession was not "reliable." *See* Ex. 1, pp. 35-36, quoting Tr. 579-81. (At one point in that quote, it seems that the stenographer mixed up who was speaking. I think it is clear that it was defense counsel who said "it's not a statement that's reliable[;] [m]aybe I can put it in terms of reliable," and that it was the judge who said "You can use that word.")

A.D.A. Curbelo argues that the petition's second point is not cognizable on federal habeas review. I reject that argument. He quotes from *Jackson v. Denno*, 378 U.S. 368, 394, 84 S. Ct. 1774, 1990 (1964), but ignores the fact that Jackson's jury was instructed "that if it found the confession involuntary, it was to disregard it entirely." *Jackson*, 378 U.S. at 374, 84 S. Ct. at 1779.

A.D.A. Curbelo erroneously claims that federal judges follow 18 U.S.C. § 3501(a) and "instruct the jury to give such weight to the confession as the jury feels it deserves under all the circumstances." On the contrary, the Supreme Court recently wrote:

> In the aftermath of *Miranda*, Congress even passed a statute seeking to restore the old regime, 18 U.S.C. § 3501, although the Act lay dormant for years until finally invoked and challenged in *Dickerson v. United States*, *supra* [530 U.S. 428, 120 S. Ct. 2326 (2000)]. *Dickerson* reaffirmed *Miranda* and held that its constitutional character prevailed against the statute.

*Missouri v. Siebert*, 124 S. Ct. 2601, 2608 (June 28, 2004).

On the other hand, A.D.A. Curbelo is correct that the state courts reasonably determined that no evidence was adduced at trial that would support an argument that the videotaped confession was involuntary.

On appeal, Ms. Everett argued:

> Here, appellant's videotaped statement, on its face, raised questions about its voluntariness – appellant told

9

the prosecutor that he had had psychiatric problems since
he was "a kid" and was under treatment. This comported
with the complainant's mother's warning that appellant
"looked on the crazy side." (DH 332). The arresting
officer, in addition, testified that appellant was
"ranting" and "raving" all afternoon at the police
station. Although the officer testified that he
previously read appellant the <u>Miranda</u> warnings, he did
not get appellant to sign a waiver. It was unclear why
the officer gave the warnings, since he claimed that he
never questioned appellant. This ambiguity raised
questions about the nature of this officer's interactions
with appellant before the prosecutor arrived. Then,
during the prosecutor's questioning, the same officer
admittedly had a mid-interrogation conference with the
prosecutor - for an unrecorded 7 minutes - before
appellant made his recorded statements about the
circumstances leading to his arrest.

(Ex. 1, p. 51.)

A.D.A. Curbelo gave a persuasive response to the Appellate
Division:

> Here, defendant had been advised of his <u>Miranda</u>
> rights by the assistant district attorney prior to making
> his videotaped statement. Defendant indicated that he
> understood his rights and was willing to make a statement
> nonetheless. Moreover, Detective Mulroy had also read
> the <u>Miranda</u> warnings to defendant earlier at the police
> station, but took no statement <u>after learning that
> defendant would make a statement on video</u> (see T. 270-
> 271, 312). After the seven-minute pause in defendant's
> video statement, the assistant district attorney reminded
> the defendant that the rights he had acknowledged at the
> beginning of the interview were still in effect (see
> People's Exhibit 13, defendant's videotape statement).
> Defendant again stated that he understood those rights
> and was still willing to answer additional questions
> (<u>Id.</u>). Significantly, <u>defendant stated that no one had
> spoken to him during the seven-minute break</u> (<u>Id.</u>). There
> were absolutely no signs of duress, coercion, physical
> abuse, threats, promises, and the like.

(Ex. 2, p. 42, with my emphasis.)

The Appellate Division considered and rejected Ms. Everett's
argument; it wrote:

> The court properly declined to deliver a jury instruction on the voluntariness of his statement to the police, or to permit counsel to make such argument to the jury, since there was no such issue raised at trial <u>or evidence to support such a claim</u> (*see People v. Cefaro*, 23 N.Y.2d 283, 296 N.Y.S.2d 345, 244 N.E.2d 42; *People v. Taylor*, 135 A.D.2d 202, 204, 524 N.Y.S.2d 708, *lv. denied* 71 N.Y.2d 1034, 530 N.Y.S.2d 569, 526 N.E.2d 61).

*People v. Powell*, 309 A.D.2d 577, 765 N.Y.S.2d 505 (1st Dept. 2003) (with my emphasis added). I find this conclusion entirely reasonable, and therefore Powell's second point does not satisfy 28 U.S.C. § 2254(d)(2) (habeas petitioner must show that the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court").

In sum, both of Powell's points should be rejected.

## CONCLUSION

For the foregoing reasons, I recommend that Judge Batts deny Powell's petition.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, any party may object to this recommendation within 10 business days after being served with a copy (i.e., no later than August 19, 2005), by mailing written objections to the Pro Se Clerk of the U.S. District Court and mailing copies (a) to the opposing party, (b) to the Honorable Deborah A. Batts, U.S.D.J., at Room 2510, 500 Pearl Street, New York, NY 10007 and (c) to me at Room 1360, 500 Pearl Street, New York, NY 10007. Failure to file objections within 10 business days will preclude appellate review. *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15, 16 (2d Cir. 1989) (per curiam); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), and 6(e). Any request for an extension of time must be addressed to the District Judge.

_____
DOUGLAS F. EATON
U.S. Magistrate Judge

Dated:   New York, New York
         August 2, 2005

11

Copies of this Report and Recommendation were mailed on this date to:

William Powell, DIN # 01A5708
Sing Sing Correctional Facility
354 Hunter Street
Ossining, NY 10562

Rafael A. Curbelo, Esq.
Assistant District Attorney
198 East 161st Street
Bronx, NY 10451

Hon. Deborah A. Batts

Copies of this Report and Recommendation were mailed on this date to:

William Powell, DIN # 01A5708
Sing Sing Correctional Facility
354 Hunter Street
Ossining, NY 10562

Rafael A. Curbelo, Esq.
Assistant District Attorney
198 East 161st Street
Bronx, NY 10451

Hon. Deborah A. Batts